Brides and grooms, the case of the morning call, 210-1019, to be the marriage of Roberts, on behalf of the Avalon, Mr. Theodore Cousinart, on behalf of the Avalon, the Avaline, excuse me, Mr. Michael Dwayne. Mr. Cousinart? Or is it Cousiniart? Cousinart. Cousinart. Good morning, Your Honors. May it please the Court, Mr. Dwayne. This matter comes before you this morning for your review of a decision made by the trial court in Kane County on August 12, 2010, related to a post-judgment petition for review of time-limited maintenance. It was filed by Gail Arrenholz. Tom Roberts challenges the trial court's findings that Ms. Arrenholz made a good-faith effort to secure gainful employment, as well as the trial court's award of time-unlimited maintenance. This court, in deciding the case of interrated marriage of Golden, citing Culp, a Fourth District case, gave specific instructions to the trial courts and family law practitioners in our state on the proper methods of drafting language in judgments and marital settlement agreements, which call for review hearings on time-limited maintenance. This court indicated in Golden that the parties should be advised as to who has the burden of moving forward, who has the burden of proof, and if maintenance will only continue if the recipient shows good-faith effort to secure employment. The parties need to know that. Now, the judgment in this case was entered on February 7, 2006. The intended marital settlement agreement was prepared by Mr. Roberts' counsel. He followed your instructions to the letter in Golden. Specifically, paragraph 3.4 of the marital settlement agreement provided for review of the maintenance, and it indicated that the payment shall terminate unless the wife files a petition to review by a particular date. The court went on to state that it must first determine if the wife has made a good-faith effort to economically rehabilitate herself. If such effort was made, the court shall determine whether or not because of that she's economically rehabilitated, and if she's not economically rehabilitated, despite the fact that she made a good-faith effort, the court then can adjust maintenance either by increasing it, decreasing it, or continuing it at the same level, depending upon the economic circumstances of the parties. Maintenance would then terminate upon the husband's death, the wife's death, remarriage, cohabitation, or on a date set specifically by the court in the order that provided for the additional maintenance. As required, Ms. Aron was filed… Did that make it incumbent upon the court to set a date? I believe so, yes, sir. That's our argument. We believe that the court, the parties by their contract, identified that that was the trial court's responsibility at the time of that hearing. Now, Ms. Aron did file a petition to review, and the trial commenced. She provided the court with her resume, as well as two exhibits, 12 and 15, which set forth, as she indicated, all the prospective employers that she had made application to. She stated that she had applied to hundreds of prospective employers. Her testimony revealed that she had a four-year nursing degree and a master's degree in psychology. Her pre-judgment work experience had included an adjunct instructor at Antioch College, extensive experience in psych nursing, individual and group psychotherapy. She and her first husband created a counseling center in Vermont, where they were involved in group and individual psychotherapy for over seven years. She was then employed for two and a half years at a children's hospital, participating in psych nursing, group therapy, where she was also involved in treating children with drug addiction and autism. Everything you testified to, or related, I should say, occurred before the suicide of her son? Yes, sir. And that particular suicide occurred, well, prior to the entry of the judgment. Prior to what? The entry of the judgment. But at the time the judgment was entered, she was not employed, correct? That's correct. And so that could have had something to do with this period of rehabilitative maintenance. Absolutely. There's no question about it. Even though she had all of these credentials, she had a lot of the credentials she even presented with at the time of the hearing when they divorced. I'm sorry? She had a lot of the credentials that you've now mentioned, obviously, at the time of the divorce. She added a few afterwards. Just a few. She was going to be certified as a school nurse, and she hadn't taken all the courses yet, and she had taken some other courses, I think in administration or something. Well, she had actually declined to take the nursing certification. She had started that and then decided that she did not want to do that because she indicated, I believe, that she was not a medical nurse. So that was not something that was interesting to her. I thought she also said something in the fact that she felt she might kill someone because she wasn't in the right frame of mind.  The judgment, the divorce judgment, or didn't that even persist now in this? That was her testimony at the time of the trial that when she first relocated to Arizona, she had some difficulties with that particular issue. But if the courts will recall, there was no treatment here. There was no testimony concerning any ongoing treatment. There was no diagnosis other than her self-diagnosis. There was nothing in the record to suggest that she even had post-traumatic stress syndrome. Well, I think she said she might have. Yes, ma'am. That's exactly what she said. It's a self-diagnosis. Well, she's got a master's degree in psychology. Doesn't that count for something? I would think, Your Honor, that if, in fact, someone's got a master's degree in psychology, that that person would understand that if, in fact, this is something that she has, that's something that she has to take care of, that she needs treatment, that she needs to see a physician, that she needs some sort of therapy, none of that occurred. I'm not aware of any case in this line that talks, although we use the word rehabilitation, we're talking about financial rehabilitation, not any mandatory psychological rehabilitation or things of that nature. Well, Your Honor, so you understand, the death of her son occurred well prior to the entry of the judgment. The two attorneys and the parties themselves, when they participated in creating this marital settlement agreement, were fully aware of the fact that this incident had occurred and took care of that by way of the rehabilitative maintenance. And if, in fact, there were some serious issues concerning post-traumatic stress symptoms, that would have occurred prior to the entry of the judgment, and there would have been some reference to that in the marital settlement agreement. There was none. Well, she didn't have any treatment before the marital settlement agreement either. That's right. So they're not necessarily. If nobody other than herself diagnosed it, I mean, I'm arguing with you now as opposed to asking you a question. I anticipated this argument. Okay. Well, we do have to give some weight or a great deal of weight to the court's observation that the petitioner appeared disorganized and confused in court. But I think under the circumstances, the court did not make any specific findings as to the fact that she was incapable of testifying, that she was incapable of working. In fact, our expert, Judith Sherrod, had the opportunity to observe Ms. Ehrenholz during the course of the deposition. She wasn't allowed to interview her, but she was able to participate as an observer during the course of the deposition. She provided me with questions to ask Ms. Ehrenholz to assist her in her analysis of her employability and her ability to function in the outside world. Her testimony at the time of the trial indicated that she was answering questions appropriately. She was intelligent. She was articulate. Certainly, that's a stressful situation when someone's in the middle of a deposition. And if, in fact, that stressful situation didn't occur during the course of the deposition, I dare say it didn't occur during the course of the trial. Your expert is a vocational opportunity expert? Yes, sir. She's not a psychologist. Does that include some expertise in dealing with dysfunctional people? Well, first of all, I have to determine whether or not this lady was dysfunctional. Well, I got the impression that the judge, when he said something in effect, she's making a good faith effort to the best of her abilities to suggest that if this was her best effort, that he was inferring without specifically saying that she is sufficiently dysfunctional that she needs further maintenance. And I don't recall your expert testifying about the job opportunities for someone who's dysfunctional. I got the impression that the opinions given by your expert related to someone who wasn't dysfunctional. Well, once again, Your Honor, I don't mean to argue with the court. You're not arguing with the court. You're telling me what you think. Under the circumstances, she wasn't dysfunctional. There was no proof that she was dysfunctional other than her own statements to that effect. This lady, over a course of four and a half years, was employed for eight months. She indicated and testified in the fact that she had made hundreds of applications. When our expert went through the documentation that Ms. Aronholz testified to contained all of the contacts that she had made, our expert, Judith Shear, was able to establish the fact that this lady made two contacts a month for four and a half years. Not applications, not interviews, not submitting resumes, less than two contacts a month for four and a half years. She worked at five different places. Caring Cooperatives was a part-time opportunity. Sunnyside School, she was a substitute nurse and was there for two weeks. Thereafter, she moved to Desert View High School, where she was a school nurse for two and a half months. Rio Rico High School for four and a half months. And Camp Laurel, she was a camp nurse for one month. For a period of four and a half years, the only efforts she made to secure employment totaled eight months out of four and a half years. Didn't she try to get a business going for two years? That was the first two years that she was out there, much like the business that she had in Vermont. But for two and a half years, that business generated no income. When you're requested or required to make a good faith effort to secure employment, your job is to find a job. And under the circumstances, this lady made little or no effort to secure employment. And the court, in essence, rewarded her for her lack of effort. Did she or did you ask her, what do you mean by you made an application? Did she simply submit over the Internet or however they were through HRs the applications and then never follow up? Did you ask her if she followed up? Do we have any evidence that she did anything other than drop pieces of paper off at various hospitals? Other than the testimony that she submitted herself and our experts' analysis of what she submitted. I mean, these were telephone calls. These were notes. These were postcards. There were very few formal applications. There were several resumes that were sent out. But this was less than two contacts a month for over four and a half years. Well, when she had the jobs, why did she need to make? She worked for about eight months, other than the two years that she tried to get the business off the ground, I think is what you're saying. These were like two and a half months, four and a half months. The court itself in its decision stated that it was puzzling to the court that she sometimes voluntarily terminated her employment before she obtained other employment. That she declined to accept employment because the pay was lower than she wanted. Ms. Scher was correct, he said, in questioning by her testimony the desire of the petitioner to seek employment. It appears that the petitioner only seeks employment in fields she thinks she would like to work in. I think the most telling comment that she made, or answer to the question that I submitted, which was with regard to businesses, doctor's offices in the Tucson area, were you aware of how many there were? And she looked at me and she said, I have no interest in that line of work. Doctors and nurses only make $15 an hour and I can't live on that. That's a conscious decision by an individual that although employment opportunities were out there, and she's required to make a good faith effort to secure employment, this job didn't pay her enough. Now, I think that the trial court, or this court in Golden, set forth the requirements. And we're asking this court, if this is the standard by which we're going to determine a good faith effort, the bar here is very, very low. This court needs to be in a position to set the standard by its ruling in this case as to what is a good faith effort. And with all due respect, Your Honors, there is nothing in the record other than this lady's testimony that she had post-traumatic stress syndrome. The trial judge indicated that she had seen a doctor tick for therapy. I would ask the courts to look at plaintiff's Exhibit No. 12. She identifies Sanctuary International and Dr. Edward Tick of Albany, New York, and she states in her exhibit, I worked and traveled with Dr. Tick for my own healing and then for the healing of the Vietnam veterans. No therapy, no diagnosis, no treatment. Did the trial court make a finding that it believed that she had post-traumatic stress disorder? I don't believe so, sir. And the court made no findings, no observations of anything that would be sufficient in my mind or the court's mind in establishing some sort of dysfunctionality. With regard to the issues concerning the awarding of time unlimited maintenance as well as increasing monthly maintenance, I think that depends upon this court's interpretation of the marital settlement agreement, which is the party's contract. The party has entered into this agreement, and as the court is fully aware, the general rules of contract interpretation apply to marital settlement agreements. Our Supreme Court in Blum v. Koster indicated that marital settlement agreements are to be construed in the same manner as any other contract. An interpretation of a contract is a question of law, which is reviewed de novo. These parties specifically narrow the focus of the trial court in the reviewing hearing. Thank you, sir. Any other questions? No, right now. Okay. Thank you. Thank you. You'll have a chance to make your vote. Yes, sir. May it please the court. Good morning, Justices. Good morning. Mike Dwayne arguing for Gail Ehrenholz-Roberts. First, I'd like to clear up a few points of difference I have with Mr. Kusnar regarding the meanings of the terms in the marital settlement agreement and the judgment. We've heard a lot about rehabilitative and time-limited maintenance, and we take the position in our brief, and I argue here today, that that is not what was provided for in the marital settlement agreement or the judgment. It was defined as permanent maintenance, titled as permanent maintenance. Judge Grady, in his decision, referenced that title that was given to the whole part of the marital settlement agreement that dealt with maintenance, identified it as permanent maintenance. Well, then if it was permanent, how could he modify it? Well, and again, I'll get back to Golden. It could still be modified up or down, and there are still terminating events, even if it's permanent. I direct the court to the Culp decision where the court stated in that decision that the difference between permanent and rehabilitative is really a fine line because really all it addresses is who would have the burden of proof in a hearing to review or modify the maintenance. But in any event, the drift that I'm getting... If it's permanent, then why would it require your client to file with a deadline? It would seem that if it was permanent, it would be the other party that would be required to file. Well, except, I mean, there's obviously, this was a settlement agreement, so there was give and take. I would refer to this clause that was put in about the good faith as kind of a gatekeeper clause. In other words, it's defined as permanent maintenance in the agreement. It's going to be reviewed under Sections 504 and 510A-5. But as a preliminary step for Gail Aaron Holtz-Roberts to get through that door to extend the maintenance, she has to establish that she's made good faith efforts to economically rehabilitate herself. What is the basis upon which we're supposed to affirm a finding of permanent need? Well, I think under Section 504 and 510, looking at all of the factors, not just focusing on this one clause, it's a gatekeeper clause, but once the trial court makes the finding that she made the good faith effort, it's a review under 504 and 510. And there can be an obligation on the part of the recipient of the maintenance to make efforts to become more self-sufficient, to get employment, to earn income, not necessarily that it's ever expected or realistic. A lot of the cases refer to how realistic it is to expect her to ever earn sufficient income to support herself and the lifestyle she enjoyed during the marriage. So, in other words, the maintenance obligation may be ongoing and permanent, but there's an obligation on the part of the recipient to become more self-sufficient with the expectation that the maintenance would be lowered. But, of course, that would be in the context of other circumstances, like, for example, Mr. Aaron Holtz, I'm sorry, Mr. Roberts' income. Was the judge's decision set forth somewhere in the record that would give us the ability to review it and determine whether or not he made a determination that this was, in fact, based upon a reasonable person benchmark, that your client made a good faith effort, or would we more likely, upon review, determine that he determined that even though this was less than adequate, it was sufficient based upon the fact that she had deficiencies or dysfunctionalities that would remediate or lessen the need for termination on the basis that she had not made reasonable attempts? Well, at 198 of the record, in Judge Grady's findings, he said the petitioner may be unemployable in any field for which she has been educated or trained, particularly in nursing, and that was immediately after he made the finding that her efforts, it had been a good faith effort on her part, considering what he perceived to be her limitations. Now, I guess my position would be that this gatekeeper clause, it's not provided for in the statute. It's something these parties crafted in their agreement, and I'm very familiar with Golden, because that was my case, and I don't know that this Merrill-Southern agreement particularly accomplished the directives from Golden, because both these people apparently walked out of the courtroom after the prove-up with a different understanding as to what was supposed to happen prior to this review. But I believe that it's a very subjective determination as to whether or not this particular litigant, Gale in this case, made a good faith effort to economically rehabilitate herself. Well, looking at the plain language of this Merrill-Southern agreement, isn't it a fact that the respondent bargained for a maintenance provision that terminated on a date specific unless your client came in and showed a good faith effort to rehabilitate herself? I agree with that statement. But now, based on this order that was entered after the hearing, after your client, according to the trial court, met that burden, we don't have a termination date. We don't have the same parameters. We just have, in essence, a permanent maintenance situation of $4,000 a month. Still subject to modification. Under the code, but not under the agreement. Well, they agreed as to what was going to happen in order for there to be an initial review. My reading of the case law and this agreement is that there was this clause that required an initial burden on the part of Gale to establish she made a good faith effort. Once she established that good faith effort, it became a review under Section 504 and 510. And following all of the case law at that point, we're past this good faith clause because the court found that she made a good faith effort. It's the same options available to the trial court as in any other review of maintenance or ruling on a petition to modify it. The court can either increase it, decrease it, extend it. All of those options under Section 510 are available to the trial court, including not providing an end date. Now, the other thing is, too, I think Bloom versus Koster changed a little bit the way trial courts deal with these determinations of maintenance on a review to basically discourage and maybe even prohibit the actual establishment of a termination date. By, in effect, taking away the right of the recipient to petition to modify three, four years down the road because nobody has a crystal ball and knows what's going to happen. That was after this judgment. Bloom versus Koster came in between. Did you make your interpretation known to the trial court? With regards to the good faith? With regard to the settlement agreement? Well, our position at the trial court was that it was permanent maintenance that they then inserted into the law. Okay, as far as their position, what was Congress's position? That it was time limited. Would you say that the trial court then was surprised that there was apparently some disagreement as to what the settlement agreement actually was defined to what, or its parameters? Well, and I wouldn't say it was referenced in Judge Grady's decision. He made a comment that there must, that this is entitled permanent maintenance. Did the trial court make specific findings as to how he was going to interpret this clause in the settlement agreement? The clause about the court reviewing maintenance setting an end date or the good faith effort clause? Well, it seems to me that there's disagreement as to what the trial court had the authority to do. What the trial court had the authority to grant relative to the relief that the parties were in contention over. And if this is based upon a settlement agreement, the trial court either should have said, it's based upon the settlement agreement, this is what I define the settlement agreement to be. Or he should have said, this is not based upon the settlement agreement, this is based upon a statute. So what did he do? Well, my position is he followed the statute, which would mean that unless the party's agreement specifically. Well, if he followed the statute, did he find that the agreement was against public policy or was so ambiguous that it was unenforceable? No, I think he interpreted the good faith clause as a preliminary step, a burden that Gail had to meet in order to have her review under 504 and 510. And what the case law provides is the litigants cannot hamstring the court as to what the court can do under 504 and 510 unless the agreement specifies that this is going to be the rules that control. In other words, the parties take themselves out of the statute. There is nothing in this agreement that says that section 504 and 510 aren't going to apply. As a matter of fact, it specifically says the review will take place under 504 and 510 once Gail meets her initial burden. So once she meets the initial burden, it's an open review under 510 and 504 and there's nothing in the agreement that restricts what the court can do with regards to the term or extension of maintenance. What if she hadn't filed anything? It would have terminated. So how can it be permanent? If she hadn't filed anything and if we take your argument to its logical conclusion, then she would have been happy with $3,000 a month for the rest of her life or until one of the factors kicked in. Well, I would just go back to the Culp case. The status of the case law right now is the distinction between permanent and rehabilitative is really more a matter of who carries the burden. So what I would say at this point is the distinction between the next review if there is one versus what happened in the trial court on this occasion is the next time it would have to be Mr. Roberts that would file a petition to modify and he'd have the burden approved to show why maintenance should be decreased or terminated based on the circumstances at that time. So there's nothing prohibiting Mr. Roberts from going back into court to seek to decrease or terminate maintenance depending on the circumstances. All we've done is between the judgment and the first review versus any subsequent petition to modify is we've just switched the burden back over to Mr. Roberts, which I think by the terms of the agreement happened when Gail met her initial burden to show good faith effort. Well, what on what basis would he come in? Because now it doesn't look like based upon the order and the his memo that I've read or his order that I've read. Now she doesn't even have a responsibility to make a good faith effort to rehabilitate herself. Well, I believe the case law and the statute apply. Still, my Gail still has that obligation under 504 and 510 and under the case law. Do you think it's the husband's burden approved to establish that she didn't? Well, and again. Is that a yes or a no? In a future modification hearing it would be Mr. Roberts' burden approved to show that Gail has not made any effort to economically rehabilitate herself, but it would still, that is under 504 and 510, that's just one factor for the court to consider. So even if he could prove that she's made no effort, that doesn't necessarily mean that maintenance would terminate. It could be reduced or there could be other circumstances that would warrant an extension of the maintenance, even if Gail doesn't meet her obligation to become economically self-sufficient. Didn't the court order specifically say that the court's ruling was in accordance with the marital settlement agreement or some reports to that effect? Yes, but he also referenced the entitling and permanent maintenance, putting in this good faith clause, and then referring to review under 510 and 504. Was the intent of the parties under this marital settlement agreement post-initial review explored at the hearing? I mean, you say the trial court made this statement that it was permanent maintenance, but was that issue fully explored? Would you agree that it's at least arguable that it's vague, the contract is vague as to those terms? Well, I would agree in the sense that with trying to follow the instruction from Golden, there was a little bit of a failure here because obviously both parties had a different understanding as to what would happen at the four-year point or three-year point. And Mr. Roberts obviously felt that he would be entitled to have it terminated unless she was gainfully employed, because how could she come up with an excuse for not being gainfully employed? And Gail felt that if she was making her best effort to gain employment, even if she was unsuccessful, she would then be entitled to have the maintenance extended. And again, based on the length of this marriage, the fact that Gail abandoned what was a successful business to move with Mr. Roberts to St. Louis for his career and then was out of the workforce for 24 years, then saying, okay, realistically, a 55-year-old woman who has not worked for 24 years, who has gone through her son committing suicide and now the divorce, and now she's going off on her own and in three years we think maintenance is going to terminate? I think that was never a realistic expectation on Mr. Roberts' part. My recollection was the order, the written order doesn't say, the word permanent isn't in that order, is that correct? In the Merrill-Sommergreen? No, in the order that was entered that's up on appeal today. No, no, and that's what I'm saying. I think under Bloom v. Koster, the trial court was simply not setting an end date, but it wasn't saying that it went on forever either. It's just that whoever files a petition for review or modification under Section 510, it will be decided under those provisions. What about the fact that she, as Mr. Kusner said, didn't seek any sort of assistance other than with Dr. Tick, who was doing something slightly different than what her circumstances were? I think the post-judgment period split up into timeframes. I think for the first two years she had a good plan. She made a good effort. She went back to what she had been successful at before. She went way out on a limb moving to Arizona because the cost of living was lower. And she made contacts. She was active. She had some references built up in what she attributed to the economy and other circumstances beyond her control. The business never took off. That was a two-year effort on her part. And as she testified to and Judge Grady referenced in his decision, she basically panicked at the end of that two-and-a-half years because she's like, I'm getting to the point where I'm going to have to be back in court on the maintenance issue, and I still don't have income. And then she started bouncing around. So I would say that she had made the good faith effort for two-and-a-half years. Now, what she did when she started to panic about this as far as jobs she took or didn't take, you know, in hindsight being 20-20, could she have benefited from seeing somebody or trying to get some job counseling or somebody to get her more grounded and directed? Who knows how that would have worked. The point is there was a fortuitous delay in the trial proceedings. During that period of time, she went and applied to every place that the Mr. Roberts expert said she could have obtained employment, and she got turned down every place she applied. Except doctor's offices and hospitals. Did she apply to many hospitals? Well, she did, although generally she was trying to get into positions that would, within the hospital setting, would be more geared towards what she had been successful at, which was the psychodrama, which isn't necessarily a program, but because of insurance won't pay for it in that case. Any other questions? No. Thank you, sir. Your time is up. Thank you, Justice. Thank you, Your Honor. First of all, the term permanent maintenance has a heading, this form over substance. When you try to determine what the terms of a contract are, you don't look at the heading. You look at the body. The body of this particular paragraph under 3.4 establishes that this is the requirements that are necessary under the terms of the review. Secondly, I disagree with Mr. Doyen about the automatic application of 504 and 510. The Blum case specifically states that they recognize that parties are free to agree to specific items, or terms rather, for modification or termination of maintenance in their agreements, only when the parties do not provide specific terms for modification or termination is the trial court then free to consider all factors in sections 504 and 510. I suggest to this court that the language of this particular marital settlement agreement negotiated by the parties, their contract, limits what the trial judge could do. When one of the justices asked about the trial court's understanding of what he was to do, his decision specifically says that the pertinent part of paragraph 3.4 of the marital settlement agreement is direction to the court as to what the court is to do. If the court finds that she has not been economically rehabilitated, despite making a good faith effort to become rehabilitated, the petitioner's maintenance may be increased, decreased, or continued in the same amount depending upon the economic circumstances of the parties now at the time of the hearing. Not what occurred prior to the time of the judgment for dissolution of marriage, not during the course of the marriage. Do you disagree with that statement in his order? That you just read, or you paraphrased it, but it was close. I believe that the parties negotiated to have the court determine whether it's increased, decreased, or whatever, based upon the economic circumstances of the time. Right. Absolutely. And Justice Kirk's question was the fact that I agree with the court, and that is failing to have an end date creates an award of permanent maintenance, number one. Secondly, shifts the burden of moving forward and shifts the burden of proof now to Thomas Roberts. And that's not what the parties intended. But there's nothing specific post-first hearing set forth in this MSA. There is not. But again, so we understand each other, Mr. Roberts is here, Ms. Erin Holtz is in Arizona. There should be an ongoing obligation, if there is to be a review, that she retains the burden of proof to establish the fact that she's continuing to make a good-faith effort. She didn't do that before the trial. She did not. He sees, but he sees two things as I read that. If the court finds that she has not been economically rehabilitated, despite making a good-faith effort to become rehabilitated, there's no question that she's really not economically rehabilitated, correct? But she's got to get over the first hurdle, and that's a good-faith effort to secure employment. And the facts not suggest, the facts are telling. She did not put forth a good-faith effort. And when an individual says to you, I can't live on $15 an hour, so I didn't even apply to doctor's offices, there are law firms that have nurses who review medical records. I know, but she bought a house, which we might expect her to do. She said it was a handyman house because she was going to sort of fix it up. Actually, that was before the incident. Well, that was in Michigan. But then she comes to Arizona, and, you know, she needs to find a house. She's found a house that she can afford as long as she's receiving maintenance, even working these jobs that she did find. So, I mean, she did work. She worked for eight months out of four and a half years. The two years she was working, she just wasn't successful at it. I mean, she tried. When does the light go out? I mean, seriously. I mean, you're in a position where you're out in Arizona, you speak Spanish, you're a nurse. You turned your back on nursing. It's not my passion. It's not my avenue. A good-faith effort, you're supposed to be opening doors, not closing doors. She closed the door on working for a physician in his office. She closed the door on any kind of medical practice. She closed the door, not dysfunctionality. It was her conscious decision to say, I can't make it on $15 an hour. I'd rather get maintenance from my husband until the time in perpetuity. That was what she did. And I would suggest to the court that, respectfully, she did not sustain her burden of showing a good-faith effort. Do you deal with termination of parental rights at all? Do I? No, I don't, sir. Because I believe there are two standards with regard to termination. One is a good-faith standard, and then the other one is reasonable progress. One's subjective, the other's objective. One is good-faith effort, which means that depending on the person's IQ, their physical capabilities, their mental capabilities, are they, based upon who they are, making a good-faith attempt? Then the other standard is whether or not, regardless of their good-faith efforts, is there substantial progress being made? And if there isn't, then there's a problem. This property settlement agreement doesn't talk about making substantial progress. It talks about a good-faith effort. Yes, sir. That's what I think the trial court ruled. Now, you claim there's no evidence other than what she testified to, correct? Yes, sir. Okay. Any other questions? No. Thank you. We'll take the case under advisement.